IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH CONIGLIO,          :         CIVIL ACTION
                         :
     Plaintiff,         :
                         :
      v.             :
                         :         NO. 15-40
CAROLYN W. COLVIN,    :
Acting Commissioner of    :
Social Security,        :
                         :
     Defendant.    :

## REPORT AND RECOMMENDATION

**MARILYN HEFFLEY, U.S.M.J.**                    **July 26, 2016**

     Joseph Coniglio ("Coniglio" or "Plaintiff") seeks review, pursuant to 42 U.S.C.

§ 405(g), of the Commissioner of Social Security's ("Commissioner") decision denying his

claim for disability insurance benefits ("DIB"). For the reasons that follow, I recommend that

Plaintiff's Request for Review be granted in part and that this case be remanded to the

Commissioner for further proceedings consistent with this Report and Recommendation.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

     Coniglio was born on June 4, 1965. R. at 208.[1] He has completed two years of college

as well paramedic school and has taken numerous firefighting courses. Id. at 235. He previously

worked as a paramedic/firefighter and as a data-entry employee. Id. at 102-03, 235. Coniglio

alleges that he became unable to work on October 26, 2005, id. at 208, due to a back injury and

---

[1]   Citations to the administrative record will be indicated by "R." followed by the page number.

degenerative disc disease, id. at 234.  Coniglio's last insured date was December 31, 2012.  Id. at 271.

Coniglio protectively filed an application for DIB under Title II of the Social Security Act on September 8, 2010.  Id. at 208.  His application was denied initially on February 18, 2011.  Id. at 133-36.  Coniglio then filed a timely request for a hearing.  Id. at 138.  On January 18, 2013, a hearing was held before an Administrative Law Judge ("ALJ").  Id. at 54.  By decision dated February 8, 2013, the ALJ found that Coniglio was not disabled.  Id. at 36-53.  Coniglio filed a timely appeal with the Appeals Council, which affirmed the decision of the ALJ and denied Coniglio's request for review, thereby affirming the decision of the ALJ as the final decision of the Commissioner.  Id. at 1-5.  Coniglio then commenced this action in federal court.

II.     **STANDARD OF REVIEW**

The role of the court in reviewing an administrative decision denying benefits in a social security matter is to uphold any factual determination made by the ALJ that is supported by "substantial evidence."   42 U.S.C. § 405(g); Richard v. Perales, 402 U.S. 389, 401 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985).  A reviewing court may not undertake a de novo review of the Commissioner's decision in order to reweigh the evidence.  Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).  The court's scope of review is "limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's finding of fact."  Schwartz v. Halter, 134 F. Supp. 2d 640, 647 (E.D. Pa. 2001).

"Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 564-65 (1988)). The court's review is plenary as to the ALJ's application of legal standards. Krysztoforski v. Chater, 55 F. 3d 857, 858 (3d Cir. 1995).

To prove disability, a claimant must demonstrate some medically determinable basis for a physical or mental impairment that prevents him or her from engaging in any substantial gainful activity for a 12-month period. 42 U.S.C. § 423(d)(1). As explained in the applicable agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirements in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted).

### III. THE ALJ'S DECISION

In his decision, the ALJ found that Coniglio suffered from the severe impairments of degenerative disc disease, status post posterior lumbar microdiscectomy and hemilaminectomy at L4-L5. R. at 42. He determined, however, that Coniglio's impairments did not meet or medically equal a listed impairment. Id. The ALJ found that Coniglio had the residual functional capacity

("RFC") through his last date insured to:

> perform the exertional demand [sic] of sedentary work, 20 C.F.R. [§]
> 404.1567(a), subject to his need to alternate between sitting and standing in thirty-
> minute increments.  He is able to stoop occasionally.  He should not be required
> to climb ladders, ropes, scaffolds, ramps or stairs as an essential element of a job.
> He should not be required to squat, kneel, operate foot controls, drive commercial
> vehicles, or work near hazards (unprotected heights, dangerous moving
> machinery).

Id. at 43.  Relying upon the testimony of the vocational expert ("VE") who appeared at

the hearing, the ALJ concluded that Coniglio could perform his past relevant work in

data entry as well as other jobs that existed in significant numbers in the national

economy, such as order clerk, telephone quotation clerk or account clerk.  Id. at 51-53.

## IV.    CONIGLIO'S  REQUEST FOR REVIEW

In his Request for Review, Coniglio contends that the ALJ erred at each step in the five-

step sequential process.  Pl.'s Br. (Doc. No. 6) at 1.  More specifically, he argues that the ALJ

made factual errors, improperly evaluated his credibility, inaccurately evaluated or failed to

consider the medical evidence and failed to present the VE with an accurate hypothetical.  For

the reasons discussed below, I find that the ALJ made crucial factual errors and

mischaracterizations of evidence that so infected his reasoning throughout his decision that his

evaluation of  Coniglio's credibility and of the medical evidence are unreliable and not based on

substantial evidence.  Accordingly, I recommend that the case be remanded for further

proceedings consistent with this Report and Recommendation.

## V.     DISCUSSION

### A.     The ALJ Made Crucial Factual Errors Regarding Coniglio's Work History that Heavily Influenced His Evaluation of the Evidence

Coniglio worked as a paramedic at Crozer-Chester Medical Center ("Crozer") from 1992 until October 2005, when he sustained a work-related injury to his back.  R. at 61-63, 235.  On February 20, 2006, he underwent surgery to repair a herniated disc.  Id. at 355.  Coniglio returned to work at Crozer from January 2007 to August 2007.  Id. at 61.  He did not, however, return to his position as a paramedic, but instead, because of continuing problems with his back, he worked 20 hours a week performing light duties that included some training as well as assisting with errands and odd jobs.  Id.  at 100-01.  In August 2007, Crozer eliminated Coniglio's part-time position.  Id. at 102.  Coniglio next worked between July 2008 and August 2008, reviewing documents and scanning them into a database for a company called Aerotek, Inc. ("Aerotek").  Id. at 102-03.  Coniglio testified that he left that job due to the physical requirements of prolonged sitting and standing which were too painful for him and because the large amounts of narcotic medication he took for his back pain caused him to make mistakes and not to be able to "do[] things right."  Id. at 103-04.

In his Disability Report, Coniglio listed his work at Crozer as being from April 2002 to May 2008[2] and reported that he worked 48 hours per week as a paramedic at the rate of $25.20 per hour.  Id. at 235.  He did not break out from this total period the time in 2007 during which he worked only part time and not as a paramedic.  In addition, in filling out his Work Activity Report, Coniglio reported his work at Crozer after the onset date of his claimed disability in 2005 as working as a paramedic from January 2007 to May 2008 for 48 hours per week.  Id. at 247.

---

[2]     Coniglio explained that he continued to receive income from Crozer into 2008 because he was being paid for previously accrued leave time.  That explanation is unrebutted in the record.

However, both Coniglio's testimony at the hearing, id. at 60-63, 99-104, and numerous

documents in the record demonstrated that the information in the Disability Report and the Work

Activity Report was inaccurate.  Coniglio explained during the hearing that he had worked at

Crozer only part time in 2007 and that he had not performed paramedic work due to his back

condition.  Id. at 60-64, 99-101.  Coniglio's part-time work status was noted in his medical

records.  See, e.g., id. at 703, 883.  It also was apparent from a review of  his FICA earnings

records.  Those records reflect that his earnings in 2007 of $15,387.58 were consistent with his

having worked, as he testified, for 20 hours per week at $25.20 per hour for seven months.  Id. at

227.  Those earnings were irreconcilable with Coniglio having worked 48 hours a week.

The ALJ wrote his opinion premised upon his mistaken belief that Coniglio had returned

to work in his prior position as a paramedic—a position classified as "very heavy work," id. at

51—for 48 hours per week for seven months in 2007.  Id. at 41, 45, 46.  He also believed that

during this period, Coniglio "did not work fewer or easier duties."  Id. at 41.  He based this latter

mistaken conclusion on Coniglio's Work Activity Report in which Coniglio responded no to a

question that asked whether he had needed "special help" to perform the jobs he held after his

alleged onset date.  Id. at 41 (citing id. at 251).  Having answered that question negatively, id. at

250, Coniglio did not check any of the boxes describing the types of special help he might have

needed, including one marked:  "I had different duties, fewer or easier duties."  Because of his

mistaken understanding that Coniglio had worked 48 hours per week as a paramedic in 2007, the

ALJ did not recognize that the "fewer and easier duties" Coniglio had performed on his return to

work at Crozer were that he performed non-strenuous office work rather than paramedic duties and that he worked only 20 hours per week.[3] Id. at 99-104.

Additionally, the ALJ mistakenly conflated the reason for termination of Coniglio's part-time work for Crozer and of his part-time, data-entry work at Aerotek. The ALJ believed that Coniglio had left his data-entry work because Aerotek had eliminated his position. Id. at 46. The ALJ concluded that Coniglio lacked credibility because he testified that he left the data entry position because it caused him too much pain. Id. As support for that conclusion, the ALJ cited a medical record that reflected Coniglio had told the doctor that his position at Crozer had ended because Crozer eliminated the positon. Id. (citing id. at 703). Coniglio's testimony that he had left Aerotek because the demands of the work caused him too much pain stands unrebutted.

Not surprisingly, the ALJ's mistaken belief that Coniglio had been able to perform the strenuous work of a paramedic for 48 hours per week for seven months in 2007 and that he only had stopped working at the data-entry position because his employer eliminated his job, heavily influenced the ALJ's evaluation of Coniglio's credibility and of the medical evidence, as well as

---

[3]    Notably, at the same time he based his decision on his belief that Coniglio had returned to full-time paramedic duties, the ALJ's opinion included a number of contrary statements premised on the belief that Coniglio did not do so. Thus, the ALJ stated that in 2007, "the claimant began to work 48 hours per week—albeit in a light duty role." R. at 45 (emphasis added). The ALJ noted "an unexplained decrease in [Coniglio's] earning beginning in January" 2007, id. at 45, but failed to connect it to Coniglio's testimony that he had worked part time in 2007. Elsewhere in the opinion, the ALJ wrote that "[b]eginning January 8, 2007, Dr. Rushton [Coniglio's surgeon] had allowed him to return to "four hour days at a sedentary position." Id. at 46 n.4 (emphasis added). The ALJ also stated that Coniglio "did not speak truthfully with regard to the circumstances underlying the loss of his two administrative jobs [i.e., at Crozer in 2007 and at Aerotek in 2008]." Id. at 49 (emphasis added). The fact the ALJ based his decision on contradictory versions of Coniglio's work history seriously undermines that decision. See Leech v. Barnhart, 111 F. App'x 652, 658 (3d Cir. 2004) (remanding because where substantial medical evidence existed in claimant's favor, a decision containing significant contradictions is unreliable).

his reasoning throughout his decision.  The ALJ stated near the outset of his opinion that "an objective assessment of the claimant's credibility and residual functional capacity will account for this activity [full-time work as a paramedic]—and the claimant's ability to work for a temporary agency [performing data entry] between July and September 2008."  Id. at 41.  He also based his opinion of Coniglio's credibility on his erroneous belief that "the claimant did not speak truthfully with regard to the circumstances underlying the loss of his two administrative jobs in 2007 and 2008."  Id. at 49.  The ALJ's misunderstanding of Coniglio's work history also colored his evaluation of the medical evidence.  The ALJ discredited the opinion of one independent medical examiner, Dr. Roy M. Lerman, M.D., who opined in April 2007 that Coniglio could return to sedentary work part time, id. at 737, based on his mistaken belief that Coniglio had, in fact, actually returned to working 48 hours per week.  Id. at 45-46 (discounting Dr. Lerman's opinion based on belief Coniglio returned to working 48 hours per week); see also id. at 46 (stating that "[it] is necessary to keep the claimant's recent work activity in mind in reviewing certain aspects of  Dr. Lerman's more recent narrative report" and rejecting Dr. Lerman's opinion that Coniglio should perform only part-time work because Coniglio had "left unsaid that [he] began to work *eight* hours per day shortly thereafter" (emphasis in original)).  The ALJ also discounted Dr. Lerman's opinion based on his belief that Coniglio "had a tendency to exaggerate his functional limitations."  Id.  He rejected the opinion of State-agency appointed independent medical examiner, Dr. Maureen Sestito, D.O., because he believed Dr. Sestito was "misguided to trust [Coniglio's] presentation."  Id. at 49.  The ALJ also rejected Dr. Sestito's opinion because he found that she had relied on Coniglio's statements regarding his back pain during her clinical examination whereas he had found Coniglio was not credible.  Id.

**B.**     __The ALJ Mischaracterized and Cherry-Picked Significant Evidence__

The ALJ's opinion is rife with mischaracterizations and selective readings of the

evidence.  For example, as part of his basis for discrediting Dr. Lerman's opinion, the ALJ noted

that Coniglio "did not complain of pain with the completion of straight-leg raises from a sitting

position."  Id. at 45 (citing id. at 533).  The ALJ neglected to mention, however, that Dr.

Lerman's records stated that straight leg raises at 85 degrees with either leg from the supine

position caused back pain and radicular symptoms.  Id. at 533.  The ALJ acknowledged that Dr.

Lerman had found Coniglio's forward flexion was limited to 20% of full and caused pain, while

his extension was limited to 20-50% and caused pain.  Id. at 45 (citing id. at 533).  He decided

not to credit those findings, however, because Dr. Lerman had indicated that he found positive

"Waddell's signs."[4]  Id. at 45 (citing id. at 538).  Even to the extent that positive Waddell's signs

can be taken as an acceptable measure of malingering,[5] it is required that a patient demonstrate at

---

[4]     The Waddell's tests were developed by Dr. Gordon Waddell as an indicator of
non-organic pain or pain caused by a psychological component. The original tests
involved 5 areas: tenderness, stimulation, distraction, regional disturbance and
overreaction. It was assume[d] that if you tested positive in 3 out of 5 areas there
was a non-organic component of your pain. Historically many have used a
positive test as a sign of malingering. However, the developer of the test, Dr.
Waddell, criticized such use in 1998.

Rodriguez v. Astrue, No. 4:10-CV-02524, 2011 WL 6337681, at *6 n.20 (M.D. Pa. Dec. 19,
2011) (citing Chris J. Main & Gordon Waddell, *Behavioral Responses to Examination: A
Reappraisal of the Interpretation of "Nonorganic Signs,"* Spine, 23(21):2367–2371 (November
1, 1998).

[5]     A number of courts have held that Waddell's signs are not "affirmative evidence of
malingering."  Wick v. Barnhart, 173 F. App'x 597, 598 (9th Cir. 2006); see also, e.g., Minor v
Comm'r of Soc. Sec., 513 F. App'x 417, 422 (6th Cir. 2013) ("'The literature . . . reveals that
there is no association between positive Waddell signs and the identification of secondary gain
and malingering. Patients with strong psychological components to their pain often display these
signs as well.'") (quoting Samuel D. Hodge, Jr. & Nicole Marie Saitta, *What Does It Mean When
A Physician Reports That A Patient Exhibits Waddell's Signs?,* 16 Mich. St. Univ. J. Med. & L.
143, 155–56 (2012)); Rodriguez, 2011 WL 6337681, at * 6 (criticizing use of Waddell's signs as

(Footnote continued on next page)

least three such signs to create an indication of psychologically-based symptoms.  Kirby v. Astrue, 568 F. Supp. 2d 1225, 1234 (D. Colo. 2008) ("Every federal court considering the issue appears to have held that, in order to be relevant, at least three of the five Waddell's signs must be present") (collecting cases).  Here, Dr. Lerman did not indicate how many Waddell's signs he had found.  R. at 538.  A finding that a claimant lacks credibility based on medical evidence that does not state how many Waddell's signs are present is not supported by substantial evidence. Kirby, 568 F. Supp. 2d at 1234 (citing Wick v. Barnhart, 173 F. App'x 597, 598 (9th Cir. 2006)).

More importantly, the ALJ failed to mention that Dr. Lerner had concluded that Coniglio's indication of positive Waddell's signs "did not meet the criteria for symptom magnification or inappropriate illness behavior."  R. at 538.  For the ALJ to decide independently that the unspecified Waddell's signs constituted evidence of malingering when the physician who noted them opined that they did not was an act of "inappropriate medical analysis." Rodriguez, 2011 WL 6337681 at *6 n.20; see Reinertson v. Barnhart, 127 F. App'x 285, 289 (9th Cir. 2005) (where physician had not ascribed significance to Waddell's signs, ALJ's finding that physician had found evidence of pain caused by non-organic factors was not supported by substantial evidence); Jadwin v. Astrue, No. 3:07CV0189, 2008 WL 4372659, at *8 (S.D. Ohio Sept. 19, 2008) (error to base credibility finding on presence of Waddell's signs when physician did not state that he believed patient to be exaggerating symptoms); see also Morales, 225 F.3d

---

evidence of malingering); Hedden v. Comm'r of Soc. Sec., No. 1:10-CV-534, 2011 WL 7440949, at *12-13 (W.D. Mich. Sept. 6, 2011) (the presence of such signs per se does not necessarily mean the patient is attempting to deceive the physician), report and recommendation adopted, No. 1:10-CV-534, 2012 WL 663186 (W.D. Mich. Feb. 29, 2012).

310, 319 (3d Cir. 2000) (an "ALJ should not substitute his lay opinion for the medical opinion of experts").

In another mischaracterization of the evidence, the ALJ stated that Coniglio had "admitted that the temporary [data-entry] job [at Aerotek] did not cause him any problems. He was able to sit, stand and lift boxes." Id. at 46. As supporting evidence, the ALJ cited generally to the "Hearing Testimony." Id. Coniglio's testimony, however, was entirely to the contrary. He testified that he was unable to work at the data-entry position for even two or three days in a row. Id. at 102-03. He explained that "[t]he amount of time sitting/standing, the positional changes, it just didn't work well with me." Id. at 103. He further testified: "I was unable to continue to perform the work. The lifting of the boxes, the sitting, the standing caused pretty severe pain, and I couldn't physically do it anymore." Id. at 60-61. When the ALJ asked whether that job "increase[d] or affect[ed his] pain levels in any way, Coniglio responded: "[v]ery much so, and that's why I stopped doing it is because it caused more harm than good." Id. at 104. Coniglio testified that, although boxes of documents weighed from five to 30 pounds, id. at 103, the most he actually lifted in that job was a "[s]tandard file, probably between two and four pounds," id. at 122. Coniglio also testified that another reason why he left the job was that his difficulty in concentrating because of the narcotic medication led him to make too many mistakes. Id. at 104.

The ALJ also found erroneously that Coniglio had not testified truthfully about the circumstances under which he left his jobs at Crozer and Aerotek. Id. at 49. The ALJ mistakenly believed that the data-entry job ended because the position was eliminated by the employer. Id. at 46. The record reflects, however, that Coniglio only worked at that job for less than two months in 2008, id. at 63, 101-04, and he testified that he left that part-time sedentary

position because he could not endure the pain that it caused him, id. at 102-04.  It was the part-time position at Crozer in 2007 that ended because Crozer discontinued the position.  Id. at 102.

The ALJ stated that after an independent medical examination on November 2, 2007, Coniglio "did not complain of more severe pain until October 2008." Id. at 47.  However, Coniglio's treating physician, Dr. Cikowski, recorded in his notes for a December 5, 2007 examination that Coniglio "has continued lower back pain and dysesthesias and paraesthesias primarily in his left leg.  He finds it difficult to sit for even short periods of time without having to get up and walk around.  He still gets episodes of spasm and pain down both of his legs." Id. at 868.  Dr. Cikowski also noted that Coniglio's surgeon "felt that there was nothing further he could do regarding a surgical fix for his pain," and continued to treat him with 60 milligrams of OxyContin twice per day and five milligrams of Oxycodone every 4 hours.  Id.  The ALJ also pointed to the fact that a February 2009 note in Dr. Cikowski's file showed Coniglio complained of "back pain x 3 wks," apparently to suggest that Coniglio had not suffered back pain before that time.  Id. at 47.  Coniglio's records reflect, however, that he had complained of significant back pain on every visit during the relevant period.  Id. at 688, 868, 873, 879, 934.

Furthermore, the ALJ also mistakenly found that the heavy doses of OxyContin and Oxycodone that Coniglio was taking "continued to work without disabling side effects" based on the fact that Coniglio had not asked to stop taking them.  Id. at 49; see also id. at 48 (noting Coniglio's "steady use of Oxy-IR and Oxycodone without reported side effects").  He did not mention that, despite the narcotic pain relievers, as well of the use, at times, of Gabapentin, Cymbalta, and Lyrica, see, e.g., id. at 189-90, Coniglio continued to report severe pain at each appointment with his treating physician.  Id. at 688, 868, 873, 879, 934.  Moreover, although Coniglio did not ask to stop taking his pain medication, he complained that the medication made

him drowsy.  Id. at 926-27; see also id. at 190 ("We will try to limit the side effects [of the narcotics] and try to maximize the benefits." ); id. at 685 ("The patient's goal is to get off the pain medication"); id. at 1252 (medications make him too sleepy to drive).  His treating physician reported that "[h]e is motivated to get off the pain meds, but reports he cannot stand for very long without getting intense pain in his lower lumbar spine."  Id. at 931.  On another occasion, Dr. Cikowski reported that "[h]e wants to be off meds at this time and has tried but pain becomes to [sic] severe."  Id. at 191.  Dr. Cikowski also noted that Coniglio had tried the alternative treatments of surgery, physical therapy, injections and a back-pain management specialist without success.  Id.  Dr. Cikowski informed Coniglio on multiple occasions that he had no other treatment to offer him but the narcotic medications.  Id. at 190-91, 926, 1252, 1254. The ALJ's assumption that a person in significant pain with no other viable treatment available to him would stop taking pain medication if that medication made him feel drowsy is both speculative and unreasonable.

The ALJ's statements that Coniglio's "treatment note confirms that the use of Provigil addresses any alleged drowsiness caused by Oxycodone" and that Coniglio is "able to counteract any drowsiness with the use each morning of Provigil," id. at 51, also are not supported by the record.  The ALJ cited as support for those conclusions to a statement in Coniglio's treatment notes that Coniglio "needs to continue with his Provigil to counteract [drowsiness]."  Id. at 1252. The treatment note does not say, as the ALJ suggests, that Provigil eliminated Coniglio's problem with drowsiness.  Instead, the record reflects that Coniglio suffered drowsiness as a result of the narcotic medication even while he was taking Provigil.  Id. at 65-66, 83, 188, 190-91.

As part of the ALJ's discussion of why it "was misguided to trust the claimant's presentation," the ALJ stated that "contrary to his need to use a cane 'whenever he goes out,' reported during his December 18, 2010 independent medical examination by Dr. Sestito, "the claimant 'paced' the room from time to time." Id. at 49 (quoting id. at 1217). What Dr. Sestito actually reported, however was as follows: "[t]he patient seemed to be in a great deal of pain in his lower back. He could not sit down during the interview. He had to stand up and hold on to furniture or pace the room. He stated that it hurt too much to remain still for his back." Id. at 1217. It is apparent from Dr. Sestito's opinion that she did not consider the intermittent pacing to be evidence of Coniglio's walking ability.

The ALJ also based his finding that Coniglio's reported need for a cane was not credible on the facts that during a November 2, 2007 independent medical examination with Dr. Armando A. Mendez, M.D., Coniglio reported that he used a cane "occasionally," id. at 703, and that in his October 11, 2010 Function Report, he stated that he used a cane "occasionally" when he experienced severe pain or spasms with leg weakness, id. at 267. Id. at 42. The ALJ failed, however, to mention any of the evidence that supported Coniglio's testimony indicating that his need for a cane increased over time. Id. at 104-05, 932, 1217, 1242, 1255, 1265. He did not mention that Coniglio's treatment records reflected that for the entire relevant period, he suffered numbness and weakness in his left leg. See id. at 531, 554, 848-49, 860, 868, 1094-96, 1217, 1230, 1257, 1261. On December 1, 2008, Coniglio reported to his treating physician, Dr. Cikowski, that he "ha[d] been having episodes of falling because of his leg getting numb." Id. at 932. At the January 18, 2013 hearing, Coniglio testified that he had fallen five times within the 18 months prior to the hearing due to weakness in his left leg. Id. at 90. Coniglio testified that in the Fall of 2012, he began using the cane more often on his treating physician's advice.

14

Id. at 104.  During a November 12, 2012 examination by Dr. Cikowski, the doctor noted that

Coniglio "would continue to use the cane to prevent falls."  Id. at 1255.  Nevertheless, Coniglio's

medical records confirm his testimony, id. at 104-05, that in December 2012, he fell on the stairs

in his home and ruptured his biceps tendon and dislocated his wrist.  Id. at 1241-42, 1244, 1265.

In a treatment note from a January 3, 2013 appointment, Dr. Cikowski commented regarding that

episode that "[Coniglio's] leg gave out and he fell this is not unusual because he does have on

going [sic] back issues."  Id. at 1265.  The ALJ's only reference to this falling episode was to

conclude that Coniglio had been dishonest because "the claimant did not *need* to use a cane on a

regular basis at any time prior to the month before the [January 2013] hearing."  Id. at 44

(emphasis in original).  He did not acknowledge either the worsening of Coniglio's leg weakness

over time or the fact that a severe fall leading to injury rationally would lead Coniglio to use the

cane more consistently.

I express no opinion regarding whether, when or to what extent Coniglio may have

needed to use a cane.  It is apparent, however, that the ALJ relied on evidence selected from

2007 and 2010 and a mischaracterization of Dr. Sestito's report to justify his conclusion that

Coniglio was dishonest in his testimony regarding his use of a cane in late 2012.  At the same

time, the ALJ failed to mention significant medical evidence and testimony that supported

Coniglio's contention that his worsening condition and frequent falls had only recently required

him to use the cane whenever he went out, even though he previously only used it sporadically.

In finding Coniglio not credible, the ALJ also relied on his opinion that Coniglio did not

see his doctors as frequently as the ALJ thought someone with severe pain would.  Id. at 47-48.

An ALJ, however, "must not draw any inferences about an individual's symptoms and their

functional effects from a failure to seek or pursue regular medical treatment without first

15

considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."  SSR 96–7p, 1996 WL 374186, at *7 (July 2, 1996); accord Newel v. Comm'r of Soc. Sec., 347 F.3d 541, 547 (3d Cir. 2003).  Here, the ALJ failed even to address Coniglio's proffered explanation.

Coniglio testified that his back condition was not covered by the only medical insurance he had during the relevant period because it was considered a pre-existing condition.  Id. at 69-70.  When he attempted to make appointments with various specialists, they refused to see him because he did not have insurance.  Id. at 72-73.  Coniglio's surgeon had informed him that he was not a good candidate for additional surgery, id. at 708, 868, 926-27, and Dr. Cikowski had advised him that the only treatment he had to offer was continued narcotic pain medication, id. at 927; see id. at 848-49, 853, 854.  In light of the fact that Coniglio was seeing Dr. Cikowski for management of his pain with medication and had been told no other treatment was available, it is not particularly probative that he saw Dr. Cikowski only approximately once every six or seven months.  See id. at 849, 853, 868, 873, 1252, 1254.  The ALJ failed to address the explanations Coniglio provided, in violation of the applicable regulation, and instead jumped to the conclusion that the infrequent visits proved that Coniglio was being dishonest about the extent of his pain.[6]

---

[6]   One comment the ALJ made regarding Dr. Cikowski's records is particularly revealing of the extent to which the ALJ's opinion of Coniglio's credibility colored his view of the evidence. The ALJ commented that the limitations of Coniglio's functioning imposed by independent medical examiner, Dr. Sestito, must be inaccurate because: "otherwise the claimant would have had bigger worries than his blood pressure and erectile dysfunction at the first visit to Dr. Cikowski's office in seven months in February 2012."  R. at 50 (citing id. at 1230).  The record the ALJ cited reflects that Coniglio had been scheduled for an appointment for a blood pressure check.  It also listed Viagra as one among the medications Coniglio was taking.  Id.  The cited record does not reflect that Coniglio was "worried about" either his blood pressure or his erectile

(Footnote continued on next page)

The ALJ also attacked Coniglio's credibility (as well as that of his doctor) on the ground that Coniglio's complaints regarding his back pain were inconsistent with the "mild approach" Dr. Cikowski took to his treatment.  Id. at 50.  Coniglio was treated with chiropractic treatment, id. at 1217,  a TENS unit, id. at 397, steroid injections, id. at 687, 692, a nerve block, id. at 685, 879, surgery, id. at 355-56, and a variety of pain medications, see, e.g., id. at 1254.  By the time of the hearing, Coniglio had been treated with increasingly large doses of narcotic pain medication for several years.  See id. at 848-49, 854, 860, 868, 873, 926, 1230, 1234, 1253, 1257, 1261, 1265.  Coniglio's surgeon, Dr. Scott Rushton, M.D., had determined that he was not a candidate for additional surgery.[7]  Id. at 868.  And, Dr. Cikowski opined that there was nothing further he could do for Coniglio other than to prescribe him daily narcotic pain medication.  Id. at 853, 926-27, 1254.  Accordingly, the ALJ's conclusion that Coniglio's credibility was undermined by the "mild approach" to his treatment is incompatible with the record.[8]

---

dysfunction.  It does reflect, however, that he was "still having low back pain and numbness in his left leg."  Id.  The record also notes that Dr. Cikowski was prescribing, and Coniglio was taking, large quantities of Cymbalta, Oxycodone and Oxy-IR to treat that pain.  Id. at 1232.  Indeed, Dr. Cikowski increased the dosage of Coniglio's narcotic pain medication during that visit in response to Coniglio's complaints.  Id.

[7]     The fact a claimant has been "told that he is not a surgical candidate [for a back condition] cannot be read to infer that his condition was not severe enough for back surgery."  Keys v. Colvin, No. 3:14-CV-1913, 2015 WL 1275367, at *18 (M.D. Pa. Mar. 19, 2015).

[8]     The foregoing is not a complete compilation of the ways in which the ALJ's opinion was inconsistent with the record.  For example, the ALJ reached his own medical decision that Coniglio had not needed all of 2006 to recover before he could return to work.  R. at 44.  In so doing, he cited medical evidence from after Coniglio's surgery and before late June 2006 even though he recognized that Coniglio suffered a recurrence of pain and numbness at that time.  Id.; see also id. at 438 (treatment note regarding recurrence).  The ALJ also discredited Coniglio based on an insurance surveillance video that showed him "engaged in various [exertional] activities" shortly before his February 2006 back surgery.  Id. at 45 (alteration in original) (quoting id. at 538).  Those "exertional activities" consisted of a single occasion on which Coniglio was observed to "help a driver place a tarp over the top of a dumpster and bend over

(Footnote continued on next page)

C.     **In Light of the ALJ's Factual Mistakes, Mischaracterizations of the Record and Failure to Address Evidence Contrary to His Decision, the ALJ's Credibility Determination is Not Supported by Substantial Evidence**

The ALJ made clear that he thought Coniglio was not truthful and that it was "misguided to trust" his statements regarding his back pain.  See, e.g., id. at 49.  When making determinations as to a claimant's credibility, an ALJ must "determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it."  Hartranft, 181 F.3d at 362.  There is no requirement that there be objective evidence of pain, but "there must be objective medical evidence of some condition that could reasonably produce pain."  Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).  "[S]ubjective complaints of pain [must] be seriously considered, even where not fully confirmed by objective medical evidence."  Id. at 1068.  If there is medical evidence "to support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence."  Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993).  "'[O]nce adjudicators determine that the individual has an impairment which is reasonably expected to produce some pain, they must consider all of the evidence relevant to the individual's allegations of pain, even if the alleged pain is more severe or persistent than would

---

and lift a board."  Id.  The independent medical advisor from whose report the ALJ took this fact, Dr. Lerman—who was selected by Coniglio's workers' compensation insurer—did not view this "exertional activity" as evidence that Coniglio's reporting of his symptoms was untrustworthy.  See id. at 538-40, 544, 552-53.  Nor does a single incident in which Coniglio engaged in a few not particularly difficult physical tasks disprove his reporting about his symptoms.  Smith v. Califano, 637 F.2d 968, 971-72 (3d Cir. 1981) (sporadic activity does not disprove disability); Akers v. Callahan, 997 F. Supp. 648, 659-50 (W.D. Pa. 1998) (same).  Moreover, to conclude from that incident that Coniglio chose to undergo, and that his surgeon chose to perform, unnecessary back surgery is far less reasonable than to conclude that patients sometimes perform tasks even though those tasks cause them pain.  The opinion also mischaracterizes Coniglio's testimony regarding his daily activities.  Compare R. at 51, with id. at 80-83, 106-07.

be expected.'" Sykes v. Apfel, 228 F.3d 259, 266 n.9 (3d Cir. 2000) (quoting Evaluation of

Symptoms, Including Pain, 56 Fed. Reg. 57928-01, 57,9732 (Nov. 14, 1991)).  "'While the ALJ

is entitled to discredit the claimant's testimony as to pain, he is required to state the facts upon

which he bases his conclusion which must be both clear and reasonable.'" Atkins v. Bowen, 690

F. Supp. 383, 389 (E.D. Pa. 1988) (quoting Singleton v. Schweiker, 551 F. Supp. 715, 722 (E.D.

Pa. 1982)).  An ALJ may not substitute his own opinion for that of a medical provider based

solely on his amorphous impressions, gleaned from the record and from his evaluation of [the

claimant's] credibility." Morales v. Apfel, 225 F.3d 310, 318 (3d Cir. 2000) (citing Kent v.

Schweiker, 710 F.2d 110, 115 (3d Cir. 1983)).

 "Pain in itself may be a disabling condition." Smith v. Harris, 644 F.2d 985, 988 (3d Cir.

1981); Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974), cert. denied, 420 U.S. 931

(1975).  "Complaints of disabling back pain are among the most difficult types of claims to

resolve with any degree of certainty." Taybron v. Harris, 667 F.2d 412, 415 (3d Cir. 1981).  This

is "because proof of pain is often made by means of subjective evidence." Id.

 Here, Coniglio's complaints of back pain were supported by the medical evidence of

record.  Coniglio's treating physician, Dr. Cikowski, id. at 926, an independent medical

examiner selected by the State agency, id. at 49, Dr.  Sestito, id. at 1217, and the State-agency

physician, Dr. Feraz Sheikh, M.D., id. at 1219, all agreed that Coniglio suffered from

degenerative disc disease.  Coniglio's treating back-pain management specialist, Dr. Anil K.

Sharma, M.D., determined that Coniglio's "primary problem is scar tissue and nerve root

entrapment." Id. at 690.  Dr. Varun Mitroo, M.D., who performed and analyzed an MRI of

Coniglio's back in July 2006, stated that it showed a "[s]mall amount of postoperative scar . . .

asymmetric to the left side, minimally narrowing the left lateral recess at L4-L5." Id. at 696.  He

opined that "[t]his could be causing irritation of the left L5 nerve in the lateral recess at this level, resulting in the patient's clinical symptoms." Id.

Because  there existed "objective medical evidence of some condition that could reasonably produce pain," Green, 749 F.2d at 1071, Coniglio's testimony regarding his symptoms was entitled to "great weight," Mason, 994 F.2d at 1067-68, and only could be rejected for reasons that were "clear and reasonable."[9] Atkins, 690 F. Supp. at 389.  The ALJ's reasoning in this case for discrediting Coniglio's testimony and his reports to his doctors cannot meet that requirement.  Based in large part on his misunderstanding that Coniglio had returned to the strenuous work of a paramedic full time in 2007 after his surgery and that he only had stopped working because his data-entry position had been eliminated, the ALJ's reasoning for discrediting Coniglio is filled with inaccuracies, including the ones detailed supra in Section V.B.

This Court makes no finding as to whether, or to what extent, Coniglio's statements were credible.  However, an analysis based on factual errors and mischaracterizations of the evidence cannot provide substantial evidence to find that a claimant's complaints of pain are not credible. See Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 357 (3d Cir. 2008) (ALJ's decision not supported by substantial evidence when it is based on mistakes and mischaracterization of evidence); Leech v. Barnhart, 111 F. App'x 652, 658 (3d Cir. 2004) (rejecting opinion that contained significant contradictions as unreliable); Hartzog v. Comm'r of Soc. Sec., No. CV 15-178, 2016 WL 1255303, at *5 (W.D. Pa. Mar. 31, 2016) (ALJ findings based on mistakes of fact

---

[9]    Moreover, because Coniglio worked for at least 10 years performing the strenuous duties of a paramedic, "his testimony about his work capabilities should be accorded substantial credibility."  Taybron, 667 F.2d at 415 n.6 (citing Dobrowolsky v. Califano, 637 F.2d 968, 972 (3d Cir. 1979)).

are not supported by substantial evidence); Shaw v. Schweiker, 536 F. Supp. 79, 83 (E.D. Pa.

1982) (remanding where ALJ "considered facts in an improper manner and lacked a proper basis

for his conclusions").  In addition, the ALJ's repeated failure to address evidence contrary to his

conclusions also requires a remand.  Burnett v. Comm'r of Soc. Sec., 20 F.3d 112, 121 (3d Cir.

2000) (decision which fails to address contrary evidence requires remand); Fargnoli v. Massanri,

247 F.3d 34, 40 (3d Cir. 2001) (same).

The ALJ's determination that Coniglio was not credible, therefore, is not supported by

substantial evidence.  Particularly in light of the importance of a claimant's subjective testimony

to the determination of whether a back impairment is disabling, see Taybron,  667 F.2d at 415,

remand is required so that an ALJ may evaluate that credibility based on an accurate

understanding of the relevant facts and the evidence of record.

**D.    The ALJ's Decision Not to Credit the Opinions of Coniglio's Treating Physicians
        and Independent Medical Examiners, Drs. Sestito and Lerman, Was Not Supported
        by Substantial Evidence**

The medical opinions of a treating physician "are entitled to substantial and at times even

controlling weight."  Fargnoli, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2)).  A treating

physician's opinion on the nature and severity of a claimant's impairment will be given

controlling weight if the opinion is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

[the] case record."  20 C.F.R. § 416.927(c)(2).  In rejecting a treating physician's assessment, an

ALJ may not make "speculative inferences from medical reports" and may not reject a treating

physician's opinion "due to his or her own credibility judgments, speculation or lay opinion."

Morales, 225 F.3d at 317-18 (internal quotation marks omitted).  Furthermore, the ALJ must

explain on the record his or her reasons for disregarding a treating physician's opinion.  Brewster

v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). It cannot be "for no reason or for the wrong

reason." Morales, 225 F.3d at 317 (internal quotations marks omitted).

It is plain, based on the mistakes and misstatements catalogued above, that the ALJ

rejected treating physician, Dr. Cikowski's treatment notes and opinions primarily for the wrong

reasons. As discussed supra in Section V.B., the ALJ based his decisions on factors such as his

erroneous beliefs that Coniglio had returned to full-time work as a paramedic, had only stopped

working in data entry in 2008 because his position was eliminated and had worked in that

position without incident. He also relied on Coniglio's purported failure to visit Dr. Cikowski

often enough to be consistent with his medical condition, Coniglio's supposed ability to use

narcotic medication without side effects, Coniglio's failure to attempt to stop taking narcotic pain

medication, and Coniglio's alleged ability to adequately address drowsiness caused by his

narcotic medication by taking Provigil. It also is evident from any fair reading of the ALJ's

decision that his views of the medical evidence were heavily influenced by his belief that

Coniglio was not credible, even though the case law does not permit an ALJ to rely on his own

credibility findings to overcome a treating physician's opinion. Morales, 225 F.3d at 317-18.

The ALJ rejected Dr. Cikowski's opinions based on his belief that Dr. Cikowski gave his

opinions "out of a sympathetic desire to help his patient." R. at 51. This conclusion by the ALJ

was wholly speculative and improper. See Leach, 94 F. App'x at 912 (ALJ is not permitted to

make speculative conclusions regarding a physician's bias without supporting evidence);

Vearling v. Astrue, No. Civ. A. 08-2343, 2009 WL 2058739, at *5 (E.D. Pa. July 9, 2009)

(ALJ's conjecture as to bias is not a proper basis for rejecting physician's opinion). The ALJ's

speculation that Dr. Cikowski wrote his treatment notes and opinions inaccurately out of

sympathy is even less justifiable in light of the fact that it presupposes that Dr. Cikowski

prescribed his patient large doses of daily narcotic medication over several years without actually believing the patient's complaints of severe pain.

The ALJ also rejected the opinion of Coniglio's treating back-pain management specialist, Dr. Sharma. Dr. Sharma opined that Coniglio's primary problem was scar tissue and nerve root entrapment. Id. at 690. His opinion regarding Coniglio's condition was consistent with Dr. Mitroo's interpretation of Coniglio's MRI. Id. at 696. Based on that assessment, Dr. Sharma treated Coniglio with steroidal injections and nerve blocks. Id. at 685, 687, 692, 879. The ALJ's sole discussion of that treating physician's opinion was to state that "[i]t is not dispositive that the possibility of an irritated nerve root led him to visit a pain management physician (Anil K. Sharma, M.D.) for an injection in April and July 2007." An "ALJ must explain on the record his [or her] reasons for disregarding the opinion of the treating physician." Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). "[A]n explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981). Moreover, an ALJ may not rely on only those pieces of the record that support his determination. Middlemas v. Astrue, No. CIV. A. 08-621, 2009 WL 578406, at *9 (W.D. Pa. Mar. 5, 2009). Instead he or she must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition." Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994). The ALJ's perfunctory rejection of Dr. Sharma's diagnosis of Coniglio's primary problem as scar tissue and nerve root entrapment, id. at 690, and of Dr. Mitroo's reading of Coniglio's MRI reflecting those conditions, id. at 696, did not satisfy those requirements.

The ALJ also rejected the December 18, 2010 opinion submitted by one of the independent consulting examiners selected by the State agency, Dr. Sestito. Id. at 49. Dr.

Sestito described Coniglio's physical limitations based on her clinical examination and concluded that "[a]t this point, the patient is definitely temporarily disabled and pending the outcome of his treatments by pain management and orthopedic, he may indeed be permanently disabled." Id. at 1218.  The ALJ based his rejection of Dr. Sestito's opinion largely on the fact he concluded that she relied on information provided to her by Coniglio during her physical examination of him.  Id. at 49.  He discounted Dr. Sestito's clinical findings based on his own belief that she had been "misguided to trust the claimant's presentation." Id.  Because, as discussed supra in Section V.C., the ALJ's credibility determination was not supported by substantial evidence, his rejection of Dr. Sestito's opinion based on the assumption that Coniglio's reporting to her was dishonest also cannot stand.  "The Court cannot assume that a correct reading" of the evidence "would not change how the ALJ would review" Coniglio's credibility and Dr. Sestito's opinion.  Lasher v. Colvin, 2015 WL 9489787, at *3 (W.D. Pa. Dec. 30, 2015).

Furthermore, the ALJ also gave little credence to the report of independent medical examiner, Dr. Lerman.  Id. at 45-46.  Dr. Lerman reported that subsequent to his back surgery, Coniglio's MRI scans revealed disc bulging, postoperative changes with enhancement of scar tissue and disc desiccation.  Id. at 534.  His examination of Coniglio demonstrated that Coniglio had only 20% of normal forward flexion in his back and only 20-50% of normal extension and that either motion caused pain.  Id.  "Rotation with extension to the right or left [also] caused increased low back pain." Id.  He found that Coniglio did not show symptom magnification or inappropriate illness behavior.  Id. at 538.  Dr. Lerman concluded as of September 2006 that Coniglio could only return on a part-time basis to sedentary work, needed to have the option to sit or stand in half-hour intervals and could only occasionally lift up to 10 pounds.  Id. at 552-53.

24

Based on his belief that Coniglio had "a tendency to exaggerate his functional limitations," the ALJ rejected Dr. Lerman's clinical findings regarding the decrease in Coniglio's ability to bend. Id. at 45.  The ALJ rejected Dr. Lerman's opinion that Coniglio could only return to part-time work in 2006 because he believed that "[i]t [was] necessary to keep the claimant's recent work activity in mind in reviewing" Dr. Lerner's report.  Id. at 46.  In particular, he found Dr. Lerner's opinion was overly cautious based on his erroneous belief that Coniglio returned to working 48 hours per week shortly after his examination by Dr. Lerner.[10]  Id. at 45-46.  These justifications, which were premised on the ALJ's erroneous understanding of Coniglio's work history, cannot support the ALJ's decision to reject Dr. Lerman's opinion.

Rejecting the opinions of those treating physicians and independent medical examiners, the ALJ instead relied heavily in his decision on the November 2, 2007 opinion of consultant examiner, Dr. Mendez.  Id. at 46. (citing id. at 702).  Dr. Mendez's opinion was substantially inconsistent with the opinions of other doctors who examined Coniglio at about the same time. See id. at 554-58 (Dr. Lerman); id. at 868, 873 (Dr. Cikowski); id. at 685, 688-90 (Dr. Sharma). He concluded Coniglio "has had persistent subjective complaints of pain in the low back and down the left leg in the absence of any convincing evidence that he has any ongoing orthopedic pathology."  Id. at 710.  The ALJ opined that the "small amount of scar tissue" resulting from Coniglio's surgery "has not been predictably or reproducibly associated with his symptoms," but was "routinely found on postoperative studies in patients who have achieved complete

---

[10]    The ALJ also based his disbelief in Coniglio's pain reporting on his exaggerated view of the "various [exertional] activities" that Coniglio engaged in shortly before his back surgery.  See supra n.8.

asymptomatic status following this disc herniation surgery."[11]  Id. at 711.  Dr. Mendez stated that

he did not have "any objective explanation for [Coniglio's] ongoing subjective complaints."  Id.

He recommended that Coniglio discontinue taking narcotic pain medication, "as there does not

appear to be objective support to continue this level of narcotic use."  Id.  Dr. Mendez concluded

that Coniglio "can certainly work" 40 hours per week, subject to a limit of lifting or carrying 20

pounds and limitations on postural activity, but not subject to any limitations on the length of

time he could sit, stand or walk.  Id.

      The ALJ's heavy reliance on Dr. Mendez's opinion is problematic.  As discussed above,

the ALJ's stated reasoning for relying on Dr. Mendez and discounting the opinions of the other

doctors, including treating physicians, is based largely on his mistakes regarding Coniglio's work

history and his disbelief in Coniglio's credibility, as well as upon numerous significant

mischaracterizations of the record.  Moreover, Dr. Mendez issued his report in 2007, while

Coniglio's last insured date was not until December 31, 2012.  Id. at 41.  "The Social Security

regulations impose no limit on how much time may pass between a report and the ALJ's decision

in reliance on it."  Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011).

Nevertheless, "'[c]ourts have been disinclined to uphold the denial of benefits when the ALJ

relied upon an outdated report of a non-treating physician, and there was evidence on the record

that the claimant's condition deteriorated after the report was prepared.'"  Coleman v. Colvin,

No. CIV. A. 14-886, 2015 WL 1000179, at *3 (W.D. Pa. Mar. 6, 2015) (quoting Link v. Soc.

---

[11]    Dr. Mendez's opinion also conflicted with that of Dr. Mitroo, the doctor who interpreted a
July 5, 2006 MRI of Coniglio's back at Lankenau Hospital.  Dr. Mitroo stated that the MRI
showed a "[s]mall amount of postoperative scar noted asymmetric to the left side, minimally
narrowing the left lateral recess at L4-L5."  Id. at 696.  He opined that "[t]his could be causing
irritation of the left L5 nerve in the lateral recess at this level, resulting in the patient's clinical
symptoms."  Id.

Sec. Disability, No. 13-812, 2014 WL 3778320, at *11 (W.D. Pa. July 30, 2014)); see also

Cadillac v. Barnhart, 84 F. App'x 163, 168–69 (3d Cir. 2003) (holding it was error to favor

medical opinion based on incomplete record over opinion based on complete record); Griffies v.

Astrue, 855 F. Supp. 2d 257, 275-76 (D. Del. 2012) (error to rely on three-year-old opinion of

consultant when record contained additional treatment records made over those three years);

Nolan v. Astrue, No. 10–1639, 2011 WL 3651152, at *19 (W.D. Pa. Aug. 18, 2011) (finding

ALJ's decision to reject treating physician's opinion in favor of consultant opinion rendered

without consideration of substantial medical evidence regarding period after consultant report

issued was not supported by substantial evidence).

　　　Here, in addition to the passage of five years, there were other reasons to question

whether Coniglio's condition had deteriorated after Dr. Mendez issued his opinion.  Coniglio

was able to work his part-time light-duty position without difficulty at Crozer from January 2007

until it was eliminated in August 2007.  Id. at 61, 703.  In July 2008, however, when he took a

position performing part-time sedentary work in data entry, he was only able to work for less

than two months before the pain caused by the limited demands of that work forced him to

discontinue it.  Id. at 102-04.  Subsequent to that failed attempt to return to work, he continued to

suffer increasing pain that lead Dr. Cikowski to prescribe increasing amounts of narcotic pain

medication.  See id. at 848, 854, 860, 926-27, 1237.  Dr. Sestito, who performed her independent

medical examination in December 2010, opined that Coniglio was "definitely temporarily

disabled and pending the outcome of [further treatment], he may indeed be permanently

disabled."  Id. at 1218.  From late 2011 to the time of the hearing in January 2013, previously

reported numbness in Coniglio's left leg became more severe, id. at 1255, and caused Coniglio to

suffer five falls, id. at 90, 104-05.  Dr. Cikowski advised Coniglio to use a cane to avoid further

falls.  Id. at 104, 1255.  In December 2012, Coniglio suffered a fall that injured his elbow and wrist, requiring surgery.  Id. at 1241-42, 1244, 1265.  All of these significant events transpired after Dr. Mendez's November 2007 opinion.  As a result, whatever the weight that should have been given to that opinion with respect to Coniglio's condition in November 2007, it cannot serve as substantial evidence to support the ALJ's conclusions regarding Coniglio's condition throughout the remainder of his insured period until December 2012, particularly when Dr. Mendez's opinion contradicted the opinion of Coniglio's treating physicians.

The ALJ's reliance on State-agency physician, Dr. Sheikh's February 2, 2011 opinion, which also contradicted the opinion of Coniglio's treating physicians, also is problematic.  "An ALJ is required to provide a 'clear and satisfactory explication of the basis on which [he or she] rests' a decision."  Burnett, 220 F.3d at 119-20 (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).  That explanation must be sufficient to allow a reviewing court to determine that the ALJ's decision was supported by substantial evidence.  Id. at 119-20.  The ALJ's explanation of his decision to rely on the opinion of Dr. Sheikh rather than those of Coniglio's treating physicians was limited to two sentences in a footnote in which he stated that he gave "great weight" to Dr. Sheikh's opinion because "his well-supported findings are consistent with several of the earlier medical source opinions" and because Dr. Sheikh "reviewed the entirety of the extant evidence" before giving his opinion.  Id. at 50 n.5.  The "earlier opinions" the ALJ cited to support Dr. Sheikh's opinion all dated from before Coniglio's failed work attempt in July to August 2008.  Id. (citing id. at 539 (Dr. Lerman—Sept. 22, 2006); id. at 552 (Dr. Lerman—Sept. 22, 2006); id. at 711 (Dr. Mendez—Nov. 2, 2007); id. at 937 (Dr. Cikowski-Apr. 4, 2008)).  Any consistency that may exist between Dr. Sheikh's opinion and these earlier opinions fails to address the question whether Coniglio's condition deteriorated between the time of those earlier

opinions and December 2012.  In addition, Dr. Sheikh's report strongly suggests that he did not

have access to or consider the entirety of the relevant evidence.  The MRI evidence Dr. Sheikh

referred to is from 2006-2007.  Id. at 1224.  The only opinion evidence Dr. Sheikh referenced is

Dr. Sestito's 2010 report.  Id. at 1225.  He did not reference any of Coniglio's treating physician,

Dr. Cikowski's records, strongly suggesting that he did not review any of those records.  Dr.

Sheikh plainly did not have access to any treatment records for the remaining two years of

Coniglio's insured period after he issued his February 2011 report.  As discussed above, those

records contain information that suggests Coniglio's condition may have continued to deteriorate

after that time.  In light of the fact that both of the bases the ALJ stated for giving great weight to

Dr. Sheikh's opinion are deficient, the ALJ failed to provide the "'clear and satisfactory

explication of the basis on which [he] rest[ed his] decision" to give greater weight to Dr.

Sheikh's opinion than to those of Coniglio's treating physicians that the law requires.  Burnett,

220 F.3d at  119-20 (quoting Cotter, 642 F.2d at 704).  His stated bases for favoring Dr. Sheikh's

opinion over those of Drs. Cikowski and Sharma do not satisfy the requirement that his

explanation be "clear and reasonable."  Atkins, 690 F. Supp. at 389; Singleton, 551 F. Supp. at

722.

Moreover, "[t]he ALJ [may not] 'pick and choose' among the evidence, selecting only

that which supports his ultimate conclusions.  Middlemas, 2009 WL 578406, at *9 (citing

Morales, 225 F.3d at 318).  Here, the ALJ failed to address significant evidence that supported

Coniglio's claim and conflicted with the conclusions in his decision.  "Where there is conflicting

probative evidence in the record, we recognize a particularly acute need for an explanation of the

reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an

explanation is not provided."  Id.

Where, as here, the ALJ's decision to reject the opinion of a treating physician is predicated on factual mistakes or mischaracterizations of evidence, that decision is not supported by substantial evidence.  Brownawell, 554 F.3d at 357; Khanna v. Astrue, No. 3:12-CV-2058, 2014 WL 6893671, at *20 (M.D. Pa. Dec. 5, 2014); Weinsteiger v. Astrue,  No. 09-1769, 2010 WL 331903, at *7 (E.D. Pa. Jan. 25, 2010)).  Even where such mistakes and mischaracterizations do not constitute an ALJ's sole basis for rejecting a treating physician, "[t]he Court cannot assume that the correct reading of the [record] would not change how the ALJ would review [the treating physician's] rejected opinions."  Lasher, 2015 WL 9489787, at *3.

For all of the foregoing reasons, I cannot find that the ALJ's decision is supported by substantial evidence.[12]

## VI.    **RECOMMENDED RELIEF**

Coniglio requests that the ALJ's ruling be "reversed."  Pl.'s Br. at 30.  To the extent that he means this as a request that the Court order an award of benefits, the request is denied.  An award of benefits only is appropriate, "when no evidentiary questions remain and the outcome of the case is dictated as a legal matter."  Monagle v. Astrue, No. 06-CV-3911, 2007 WL 2571453, at *4 (E.D. Pa. Aug. 24, 2007); accord Hoff v. Astrue, No. 08-cv-00218, 2009 WL 229764, at *13 (E.D. Pa. Jan. 30, 2009).  In this case, although I find that, in light of the numerous errors and mischaracterizations that underlie both the ALJ's evaluation of Coniglio's credibility and of the medical evidence, the ALJ's decision cannot stand, evidentiary questions remain concerning whether Coniglio is entitled to benefits.  Accordingly, this case should be remanded so that an

---

[12]    Because I recommend that this case be remanded for a new evaluation of Coniglio's RFC, it is unnecessary to address Coniglio's argument that the ALJ failed to accurately convey his limitations in the hypothetical to the VE.

ALJ may properly evaluate Coniglio's claim based on an accurate reading of the record. Accordingly, I make the following:

## **RECOMMENDATION**

AND NOW, this 26th day of July, 2016, IT IS RESPECTFULLY RECOMMENDED that Plaintiff's Request for Review be GRANTED IN PART, and the matter be REMANDED to the Commissioner for further review consistent with this Report and Recommendation. The Commissioner may file objections to this Report and Recommendation within 14 days after receiving a copy thereof. See Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE